**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Pure Wafer, Inc., | No. CV-13-08236-PCT-JAT |
| Plaintiff, | **FINDINGS OF FACT AND CONCLUSIONS OF LAW AND PERMANENT INJUNCTION** |
| v. | |
| City of Prescott et al., | |
| Defendants. | |

Two sophisticated entities, a wastewater discharger and a sanitary sewer service provider, contract for the ongoing treatment of effluent having a known chemical composition. Their comprehensive agreement includes among its provisions a promise by the wastewater discharger that it will conduct its industrial operations in compliance with environmental regulations. Subsequently, the state imposes new environmental regulations upon the sewer provider, which increase the provider's cost of performance under the contract.

Unhappy that the contract does not permit shifting these costs to the wastewater discharger, the sewer provider—who happens also to be the local municipality—enacts its own environmental regulation effectively banning the discharger's effluent from entering its sewer system. The regulation also permits the discharger (or any other industrial business) to create a new contract with the municipality for the acceptance of nonconforming effluent, but only if the discharger bears the cost of treatment.

The issue presented is whether the municipality may unilaterally obtain additional, not-bargained-for contractual benefits under the guise of environmental regulation. For

1    the reasons that follow, the Court concludes that such action violates the United States

2    Constitution and Arizona Constitution's prohibitions on impairment of contract rights.

3    **I.   PROCEDURAL HISTORY**

4            Pure Wafer, Inc. ("Pure Wafer") brought this action against the City of Prescott,

5    Arizona (the "City") as well as the City's individual administrators in their official

6    capacities for alleged violations of the federal and State Contract Clauses stemming from

7    the City's enactment of an ordinance impacting a contract between the City and Pure

8    Wafer.[1] (Doc. 1; Doc. 19). Pure Wafer sought a preliminary injunction enjoining the City

9    from enforcing the ordinance against Pure Wafer until the issuance of a final judgment

10   determining the constitutional claims. (Doc. 22).

11           After beginning the hearing on the motion for a preliminary injunction, (Tr.

12   12/19/13), the Court and the parties agreed that no genuine disputes of fact existed, a

13   speedy resolution was in the best interests of all of the parties, and that the bench trial on

14   the merits could be consolidated with the hearing. (Tr. 12/20/13). The parties

15   subsequently stipulated to (1) consolidating the hearing with the trial on the merits; (2)

16   bifurcating the trial on the merits into a liability phase, to be tried first, and a damages

17   phase, if necessary, with the Court's judgment as to liability in the form of an

18   immediately appealable judgment; (3) not filing any motions for summary judgment as to

19   liability and instead filing post-trial briefing with the Court; (4) holding closing

20   arguments after the completion of the post-trial briefing; and (5) the City agreeing not to

21   enforce the ordinance against Pure Wafer until after the Court's entry of judgment on the

22   merits and, if appealed, after the Ninth Circuit Court of Appeals issued its mandate. (Doc.

23   60).

24           The Court approved the stipulation as to each of the points listed above and,

25   pursuant to Federal Rule of Civil Procedure ("Rule") 65(a)(2), advanced the trial on the

26   merits and consolidated it with the hearing on the motion for a preliminary injunction,

27   _____

28        [1] Pure Wafer also alternatively claims against the City for breach of contract and
     the implied covenant of good faith and fair dealing. (Doc. 19 at 18-22).

1   with the evidence already received at the hearing to be included in the consolidated trial

2   record. (Doc. 61 at 2).

3       Now, considering the bench trial, (Tr. 12/19/13; Tr. 1/14/14), post-trial briefing,

4   (Docs. 76, 77, 81, 83), and closing arguments (Doc. 84), the Court finds and concludes as

5   follows:

6   **II.    BACKGROUND & FINDINGS OF FACT**

7       **A.    The Parties' Negotiations**

8       Pure Wafer and its predecessor-in-interest Exsil, Inc. ("Exsil") are and were,

9   respectively, companies engaged in the reclamation of silicon wafers used in the

10  semiconductor industry.[2] (Tr. 12/19/13 at 108; Ex. 5). By 1996, Pure Wafer operated two

11  "reclaim" facilities[3] in San Jose, California and Sulphur, Oklahoma. (Tr. 12/19/13 at

12  29:7-15). The City recruited Pure Wafer to locate its next facility in Prescott, and offered

13  Pure Wafer water and sewer rights as incentives to locate in the Prescott Airpark. (*Id.* at

14  40:9-13; Tr. 1/14/14 at 78:18-23).

15      Pure Wafer was willing to incur the substantial initial capital investment to

16  construct a reclaim facility in Prescott only if the City agreed to commit to maintaining

17  water and sewer services to the facility at the specifications Pure Wafer needed to

18  productively operate its facility. (Tr. 12/19/13 at 31:1-13; Tr. 1/14/14 at 76:24-77:5). Pure

19  Wafer's insistence upon these commitments was informed by its experiences with its San

20  Jose facility in the mid to late 1980s. Pure Wafer had not had a development agreement

21  with the City of San Jose; when that city later restricted the fluoride concentration in

22  sewer customers' effluent, Pure Wafer had to incur unexpected expenses in adding

23  treatment infrastructure to its facility. *See* (Tr. 12/19/13 at 31:16-32:8). Pure Wafer did

24  not want to build a Prescott facility that could be "rendered useless at any time by the

25  _____

26      [2] Because Pure Wafer is Exsil's successor-in-interest, for convenience the Court's
    references to Pure Wafer also refer to Exsil for the period prior to Pure Wafer's
27  succession to Exsil's rights and interests.

28      [3] "Reclaim facility" is a term used in the industry to describe a facility that
    reclaims silicon wafers.

City." (*Id.* at 32:7-8).

During discussions between Pure Wafer and the City, Pure Wafer disclosed to the City the chemical profile of its effluent. (*Id.* at 31:1-10). Pure Wafer provided the City with a spreadsheet listing effluent quality parameters for its San Jose and Sulphur facilities, which showed that the range of fluoride concentration in the effluent from those facilities was 10 to 150 mg/L, with an average of 40 mg/L. (Ex. 1). Pure Wafer and the City discussed the City's concerns regarding the 150 mg/L maximum fluoride concentration, and Pure Wafer ultimately agreed to design its facility to discharge effluent containing a maximum fluoride concentration of 100 mg/L. (Tr. 12/19/13 at 37:2-38:4). Pure Wafer would not construct the Prescott facility without a commitment from the City that it could discharge up to 100 mg/L of fluoride. (Tr. 1/14/14 at 76:24-77:5). Pure Wafer had considered Flagstaff as a potential location for its facility but Flagstaff would not commit to accept the necessary fluoride concentration levels. (Tr. 12/19/13 at 41:2-7).

**B.    The Agreement**

On February 11, 1997, Pure Wafer and the City entered into a development agreement (the "Agreement"), the terms of which provided for Pure Wafer to build and operate a reclaim facility in the Prescott Airpark, with the possibility for future expansion. (Ex. 3). The Agreement requires the City to provide Pure Wafer with a water supply of up to 195,000 gallons per day and sewer capacity of up to 195,000 gallons per day. (*Id.* §§ 4.1, 4.2).

Specifically, section 4.2 of the Agreement states:

> City shall provide Developer initially with a one hundred forty-five thousand (145,000) gallon per day sewer capacity (the "Initial Sewer Capacity") and, if the Expansion is constructed, with an additional fifty thousand (50,000) gallon per day sewer capacity (the "Additional Sewer Capacity") (the Initial Sewer Capacity and the Additional Sewer Capacity are hereinafter collectively referred to as the "Sewer Capacity"). The Sewer Capacity shall be used on an ongoing and consistent basis each day the Facility or Expansion is in operation . . . . City shall reserve in its sewer disposal system at all times . . . the amount of capacity required to deliver the Sewer Capacity described in the first sentence of this section

> 4.2. . . . City shall be obligated to augment such facilities if they prove to be inadequate, by constructing at no cost to Developer, all mains, lines, and other facilities necessary to accept or accommodate the additional sewer flow or effluent from the Facility and the Expansion. No up-front or other fees or costs shall be imposed on Developer with respect to the Sewer Capacity provided for herein, except as provided in Section 4.5. . . . The Sewer Capacity shall be at no cost to Developer except the payments for normal sewer usage fees as hereinafter provided. For all periods during which Developer's effluent meets the applicable quality standards for the Average Residential Classification, Developer shall pay for such effluent at the rates set forth on Exhibit E hereto . . . . In no event, however, shall the rate charged to Developer be less favorable than the rates then being charged by City to any other Average Residential Classification users, unless the Facility is reclassified as permitted in the following sentence. City shall not reclassify the effluent from the Facility or the Expansion into any classification other than the Average Residential Classification unless there is a material change in the waste water quality from the specifications attached hereto as Exhibit F, which by this reference is incorporated herein. . . .

(*Id.* § 4.2).[4]

Exhibit F to the Agreement is labeled "Typical effluent characteristics / Exsil, Prescott facility" and provides a listing of "typical value[s]" and "maximum[s]" for various chemical characteristics of Pure Wafer's effluent. It specifies for fluoride a typical value of 50 mg/L, with a maximum of 100 mg/L. (*Id.* Ex. F).

In addition to specifying the terms of water and sewer service, the Agreement contains several other provisions relevant to the present lawsuit. Section 9.1 requires Pure Wafer to comply with all applicable environmental laws:

> Developer represents and warrants that . . . Developer will operate the Facility and the Expansion (if constructed), in accordance with all applicable local, state, and federal environmental regulations.

(*Id.* § 9.1).

In section 14.14, the City also agreed to exempt Pure Wafer from subsequent changes in certain City laws:

---

[4] Section 4.5 provides that Pure Wafer shall pay impact fees for the development of the facility. (Ex. 3 § 4.5).

- 5 -

> City agrees that in the event it adopts any ordinance, regulation, or policy imposing a moratorium on issuance of building permits, water hookups, sewer hookups, or any other matter than [sic] would otherwise prevent Developer from realizing the benefits of this Development Agreement for either the Facility or the Expansion, as permitted by A.R.S. § 9-463.06(D) . . . . City shall include in any such ordinance, regulation, or policy an exception of the Facility and the Expansion from such moratorium.

(*Id.* § 14.14).

Additionally, the parties agreed, for severability purposes, that Pure Wafer's fundamental purpose for entering into the Agreement included the provision of water and sewer services on the terms specified. (*Id.* § 14.5).

Finally, the Agreement contains a merger clause providing that the Agreement is a complete integration of the parties' agreement and all prior negotiations and agreements are superseded. (*Id.* § 14.7).

## C. The Facility's Operations and Effluent

Pure Wafer built its Prescott facility in 1997, and expanded it in 2002. (Tr. 12/19/13 at 23:17-18). The total cost of construction and expansion was approximately $35 million. (*Id.* at 24:5-8). The facility has operated continuously since 1998, and employs approximately 100 people. (*Id.* at 21:15-16, 187:21-188:1). The City has to date supplied Pure Wafer with all of the water required under the Agreement and has accepted all of Pure Wafer's effluent. (*Id.* at 43:4-9, 43:18-21).

Pure Wafer's effluent presently contains a fluoride concentration of approximately 40 mg/L, (Ex. 22), and has never exceeded 100 mg/L in fluoride concentration or 195,000 gallons per day in volume. (Tr. 12/19/13 at 43:18-21, 44:5-17). This effluent is discharged directly into the City's sanitary sewer system and the City delivers it to the City's Airport Water Reclamation Facility ("AWRF") for treatment. (*Id.* at 142:14-17, 187:21-188:1). Pure Wafer is the only source of fluoride entering the AWRF. (*Id.* at 142:18-23). The AWRF is a wastewater treatment plant that processes and treats effluent from City sanitary sewer users. (Ex. 37 at 2). Treated effluent from the AWRF is discharged either to golf courses for irrigation purposes or into recharge basins for

1    replenishing the aquifer. (*Id.* at 136:8-18, 153:5-13).

2        The recharge basins at issue are adjacent to the AWRF and are "open areas that

3    are bermed that are suitable for containing discharged effluent from the treatment plant

4    for percolation and recharge of the aquifer below." (*Id.* at 136:15-18; Ex. 48). Treated

5    effluent from the AWRF flows into these basins, where it percolates into the

6    groundwater.

7        **D.    State Regulation of the AWRF**

8            **1.    The Groundwater Protection Permit**

9        During the 1997 to 1998 timeframe when the City negotiated with Pure Wafer for

10   the development of the reclaim facility, the facility was constructed, and the facility

11   began operations, the City was not required to sample effluent discharged from the

12   AWRF for fluoride. (*Id.* at 222:14-20). At that time, the City operated the AWRF under a

13   Groundwater Quality Protection Permit from the Arizona Department of Environmental

14   Quality ("ADEQ"). (*Id.* at 148:13-14, 222:14-20). This permit required the City to

15   sample and test for fluoride only in the aquifer itself, specifically in the AWRF recharge

16   basins, via a series of monitoring wells. (*Id.* at 183:12-15; Ex. 151 at CITY000880). The

17   monitoring wells are approximately 400 feet deep and immediately adjacent to the

18   recharge basins; they sample the groundwater by pumping it from underneath the basins.

19   (Tr. 1/14/14 at 9:13-18). Under the permit, the fluoride concentration in these samples

20   could not exceed 4.0 mg/L. (Ex. 151 at CITY000882).

21       Test results from the monitoring wells show that Pure Wafer's effluent has not had

22   any effect upon the fluoride concentration in the aquifer. In October 1997, before Pure

23   Wafer's facility was operational, the monitoring well readings indicated a fluoride

24   concentration in the aquifer of less than 0.4 mg/L. (Ex. 65; Tr. 12/19/13 at 183:16-21). At

25   all times from 1997 through 2013, the monitoring well readings have indicated a fluoride

26   concentration of less than 0.4 mg/L. (Tr. 12/19/13 at 184:1-5, 185:5-10).

27            **2.    The Aquifer Protection Permit**

28       As early as 1994, ADEQ informed the City that its Groundwater Quality

1    Protection Permit would no longer be sufficient for the operation of the AWRF. (Ex. 39).
2    As letters from ADEQ to the City indicate, ADEQ required the City to obtain an Aquifer
3    Protection Permit ("APP") for the AWRF's continued operation. *See* (Ex. 39; Ex. 40). In
4    April 1998, the City applied to ADEQ for an APP, noting that both the City and ADEQ
5    had contemplated converting the existing Groundwater Quality Protection Permit to an
6    APP. (Ex. 41 at ADEQ000016; Tr. 12/19/13 at 148:13-19).

7        On January 24, 1999, ADEQ issued an APP to the City and vacated the City's
8    Groundwater Quality Protection Permit. (Ex. 146 at CITY00792-93). The APP, in
9    addition to maintaining the 4.0 mg/L limit for fluoride concentration in the monitoring
10   wells, requires the City to quarterly sample and test for fluoride at the point of effluent
11   discharge from the AWRF into the recharge basins. (Tr. 12/19/13 at 148:20-25, 152:6-14;
12   Tr. 1/14/14 at 10:8-16, 10:23-25; Ex. 146 at CITY000793, -803). The point of discharge
13   fluoride concentration must remain at or below 4.0 mg/L. (Ex. 146 at CITY000803).
14   ADEQ, not the City, controls the sampling locations, and prior to the City being subject
15   to the APP, the City had never sampled for fluoride at the point of discharge. (Tr.
16   12/19/13 at 152:13-14; Tr. 1/14/14 at 10:20-22).

17                        **3.      The City's APP Violations**

18       Fluoride concentrations at the AWRF point of discharge almost immediately
19   exceeded the 4.0 mg/L APP limit. In December 1999, ADEQ sent a "Notice of
20   Violation" to the City concerning its fluoride discharge, which had exceeded the APP
21   limit on one occasion during the second quarter of 1999. (Ex. 43 at ADEQ000301). The
22   City notified Pure Wafer of the violation; Pure Wafer assisted the City in lowering the
23   fluoride concentration by adjusting its processes. (Tr. 12/19/13 at 45:13-19, 46:9-14).
24   This Notice of Violation was later closed after the City met the fluoride limit for the
25   fourth quarter of 1999. (Ex. 44).

26       Between 2000 and 2004, there were no issues between the City and Pure Wafer
27   concerning fluoride incidents. (Tr. 12/19/13 at 46:20-23). On June 11, 2004, ADEQ
28   issued the City a Notice of Violation for excessive fluoride concentrations on seven days

between September 2003 and May 2004. (Ex. 141 at PW0001). The City's response to ADEQ noted that "The City of Prescott signed an agreement with the Company EXSIL inc. [sic] on 2/11/97 allowing them to discharge [f]luoride between 50 mg/l and 100 mg/l" and that the flows at the AWRF had not been sufficient to dilute this discharge. (Ex. 138 at CITY000727). However, the City sent a letter to Pure Wafer nine days later asserting that Pure Wafer was violating the Agreement as well as various provisions of the Prescott City Code because Pure Wafer's effluent had caused the City to violate its APP. (Ex. 10 at PW0008). Pure Wafer denied violating the Agreement or any environmental regulations, but agreed to voluntarily reduce its fluoride discharge. (Ex. 11 at PW00011). The City subsequently informed ADEQ that it had "taken additional steps to ensure there is an adequate pretreatment program in place to avoid this situation from occurring again." (Ex. 12 at PW00034).

Between 2004 and 2008, fluoride levels were not an issue between the City and Pure Wafer. (Tr. 12/19/13 at 48:1-3). In 2008, ADEQ audited the City's environmental regulations for wastewater treatment; as part of this audit, ADEQ visited Pure Wafer and found no deficiencies in its facility. (Ex. 15 at PW000394). But in October 2009, the fluoride issue returned; in that month, the City informed Pure Wafer that the City had exceeded its fluoride limits at the AWRF point of discharge and had sent a Notice of Exceedance to ADEQ. (Ex. 16). The City threatened that if it were fined by ADEQ (up to $25,000 per day), it would impose those fines on Pure Wafer, and the City requested that Pure Wafer "volunteer" to immediately reduce its fluoride discharge. (*Id.*)

The City again contacted Pure Wafer in October and December 2010, when it accused Pure Wafer of violating the Agreement as well as EPA regulations. (Ex. 18; Ex. 19). The parties subsequently exchanged a series of letters disagreeing as to their respective obligations under the Agreement.[5] (Ex. 20; Ex. 21; Ex. 22; Ex. 23).

---

[5] Meanwhile, in January 2012, ADEQ issued the City an amended APP for the AWRF, which left the fluoride discharge limits unchanged. (Ex. 119). Because the amendment did not affect the fluoride discharge limits, for the sake of brevity the Court does not distinguish between the APP and amended APP.

ADEQ conducted a field inspection of Pure Wafer in March 2012 for the purpose of determining whether Pure Wafer was in compliance with the City's APP.[6] (Ex. 24 at PW00055). ADEQ stated that Pure Wafer did not operate under either a reuse permit or an APP. (*Id.* at PW00056). Specifically, ADEQ noted that "[t]he City of Prescott is the final authority for the quality of wastewater acceptable in order to meet the City of Prescott Aquifer Protection Permit # 101733." (*Id.* at PW00058). ADEQ concluded Pure Wafer's effluent complied with EPA regulations. (*Id.* at PW00057-58). Since this audit, Pure Wafer has not had any contact with ADEQ. (Tr. 12/19/13 at 52:23-53:1).

In July 2012, ADEQ issued the City a Notice of Violation because the AWRF discharge fluoride concentration exceeded the APP limit during the preceding months. (Ex. 114). In response, the City promised ADEQ that it would enact a pretreatment program to ensure compliance with the APP. (Ex. 113). Accordingly, the City informed Pure Wafer in March 2013 that it would enact an ordinance implementing a pretreatment program and that this ordinance would limit Pure Wafer's fluoride discharge to 16.3 mg/L. (Ex. 26 at PW00085, -91).

### E.    The Ordinance

On May 28, 2013, the City enacted Ordinance No. 4856-1313 (the "Ordinance") implementing the City's pretreatment program. (Ex. 28). The Ordinance imposes new requirements upon sewer users, and establishes local limits for the concentrations of certain chemicals in users' effluent. The Ordinance prohibits Pure Wafer, as a significant industrial user,[7] from discharging into the City sewer system effluent containing more than 16.3 mg/L of fluoride:

In  addition  to  the  prohibitions  specifically  listed  under

---

[6] There are some discrepancies concerning the date of the inspection. Although the inspection report is dated May 24, 2013 and states that the inspection was conducted on March 28, 2013, the photographs accompanying the report are dated March 28, 2012. (Ex. 24). Significantly, a June 4, 2012 letter from Pure Wafer to the City references and includes a copy of the report. (Ex. 25). Accordingly, the Court finds that the inspection must have occurred in 2012.

[7] The Ordinance adopts the EPA's definition of a "significant industrial user." *See* Prescott, Ariz. City Code § 2-1-9 (2014) (citing 40 C.F.R. § 403.3).

1
2
3
4
5

> Section 2-1-39, the Public Works Director is authorized to establish local limits pursuant to 40 CFR 403.5(c). Table A of this section lists the pollutant concentration limits that have been established to protect the POTW against pass through and interference. Each user who discharges an indirect discharge to the POTW and is designated as a significant industrial user as defined in Section 2-1-9 shall not discharge or cause to be discharged at any entry point to the POTW any wastewater containing in excess of the following local limits:

6

> * * *

7

> Parameter            Local Limit            . . .

8

> * * *

9

> Fluoride            16.3 mg/l            . . .

10

11

Prescott, Ariz. City Code § 2-1-44(B) (2014). The Ordinance also makes it unlawful for

Pure Wafer to be a cause of the City's APP violations:

12
13
14

> Except as provided in this section, no user shall discharge or cause to be discharged . . . any of the following described water or wastes to any public sewer:

15
16

> (G) Any water or waste containing a . . . substance in sufficient quantities to . . . cause effluent of the wastewater treatment plant to come out of ADEQ compliance."

17

*Id.* § 2-1-39(G).

18

The Ordinance requires Pure Wafer to provide such pretreatment as necessary to

19    reduce the "objectionable characteristics or constituents" to within these maximum limits

20    and as necessary to comply with any pretreatment requirements. *Id.* § 2-1-45. Pure Wafer

21    must bear all costs of pretreatment.[8] *Id.* §§ 2-1-45, 2-1-46.

22

Under the Ordinance, sewer users who fail to comply with these requirements are

23    subject to a number of enforcement mechanisms. For a violation of the pretreatment

24    requirements, the City may (1) enter into consent orders; (2) terminate water and sewer

25    service; (3) assess administrative fines of up to $25,000 per violation, per day; (4) impose

26    civil penalties of up to $25,000 per violation, per day, plus any penalties the City pays to

27

28

[8] The Ordinance also contains other requirements that may impose costs upon Pure Wafer inconsistent with the Agreement. *See* Prescott, Ariz. City Code §§ 2-1-18-L, 2-1-21, 2-1-48(F), 2-1-72-1 (2014).

- 11 -

ADEQ for the violation, plus attorneys' fees and costs of enforcement; and (5) criminally prosecute the user and assess criminal penalties. *Id.* §§ 2-1-50-1, 2-1-50-2, 2-1-50-3. These remedies are nonexclusive; the City may assess some or all of them against a noncompliant user. *Id.* § 2-1-50-2(D).

However, although the Ordinance requires and provides an enforcement mechanism for pretreatment, it also permits the City to contract around the pretreatment requirements if the sewer user bears the cost of pretreatment:

> Nothing in this chapter shall be construed to prevent any special arrangement between the City and any industrial concern whereby an industrial waste of unusual strength or character may be accepted by the City for treatment, subject to payment for the cost of such treatment by the industrial concern, except that any special agreement must be at least as stringent as applicable state and federal requirements.

*Id.* § 2-1-49.

### F.      Implementation of the Pretreatment Program

As part of its pretreatment program, the City also adopted in May 2013 an Enforcement Response Plan that established the "enforcement procedures used for wastewater discharge violations." (Ex. 29 at PW000281). Contemporaneously, the City entered into a consent order with ADEQ in which the City submitted its pretreatment program for ADEQ's review and promised to within a year "perform the actions reasonably necessary to address the fluoride exceedances in the effluent at the [AWRF], including the implementation of any pretreatment activities." (Ex. 30 at 4). After that year, the City is required to document four consecutive quarters of fluoride levels in compliance with the APP. (*Id.*)

While the ADEQ review was pending, the City notified Pure Wafer that the new pretreatment program required Pure Wafer to apply for an Industrial Wastewater Discharge Permit ("IWDP") by August 11, 2013 or Pure Wafer would face enforcement actions under the Enforcement Response Plan. (Ex. 108). Pure Wafer applied for an IWDP, reserving its rights to challenge the constitutionality of the Ordinance. (Ex. 31, 107). ADEQ approved the City's pretreatment program on October 1, 2013. (Ex. 34 at 5).

1    The City has to date not terminated Pure Wafer's water or sewer services pursuant

2    to the Ordinance. (Tr. 12/19/13 at 43:4-9, 43:18-21). Pure Wafer estimates the cost of

3    complying with the Ordinance as approximately $1 million and $4 million in capital costs

4    and $360,000 to $720,000 in annual operating costs, but these figures are preliminary and

5    the company has not conducted a study. (*Id.* at 65:21-66:8). The City has commissioned a

6    study on pretreatment options, with that report concluding a net present cost of $112

7    million for pretreatment over 20 years. (*Id.* at 65:12-17). The City estimates $2.7 million

8    in capital costs and $8.5 million in annual operating costs. (*Id.* at 65:1-11). Pure Wafer

9    believes it likely would close the facility if required to pay such costs, partly because they

10   would not be economically feasible, and partly because such an investment would be

11   unsound as the City could at any time further restrict fluoride concentrations and force

12   the facility to close. (*Id.* at 66:21-67:7).

13   **III.    ANALYSIS & CONCLUSIONS OF LAW**

14   The resolution of the issues in this case hinges on the nature and extent of the

15   City's obligations to accept Pure Wafer's effluent under the terms of the Agreement.

16   Accordingly, the Court will first determine whether the Agreement obligates the City to

17   accept Pure Wafer's effluent containing up to 100 mg/L of fluoride, as Pure Wafer

18   contends it does.

19   **A.    The Contractual Relationship**

20   Pure Wafer contends the Agreement granted it the contractual right to discharge

21   effluent with a fluoride concentration not exceeding 100 mg/L. (Doc. 77 at 16-19). In

22   interpreting a contract, a court is to "ascertain and give effect to the intention of the

23   parties at the time the contract was made if at all possible." *Taylor v. State Farm Mut.*

24   *Auto. Ins. Co.*, 854 P.2d 1134, 1138 (Ariz. 1993) (quoting *Polk v. Koerner*, 533 P.2d 660,

25   662 (Ariz. 1975)). The contract must be construed such that "every part is given effect,

26   and each section of an agreement must be read in relation to each other to bring harmony,

27   if possible, between all parts of the writing." *Chandler Med. Bldg. Partners v. Chandler*

28   *Dental Grp.*, 855 P.2d 787, 791 (Ariz. Ct. App. 1993). Although extrinsic evidence may

1   not be offered to contradict or vary the terms of a contract, it may be admissible "to

2   determine the meaning intended by the parties" if the court finds "that the contract

3   language is 'reasonably susceptible' to the interpretation asserted by its proponent."

4   *Taylor*, 854 P.2d at 1140.

5   **1.      The Agreement's Maximum Fluoride Limit**

6          There is no language in the Agreement that limits Pure Wafer's right to discharge

7   effluent to a particular maximum fluoride concentration. Section 4.2 of the Agreement

8   governs the City's obligation to provide sewer services, but it speaks only as to volume

9   and rates. Nor does any other section of the Agreement specify a fluoride limit. The sole

10  reference to a particular maximum fluoride concentration is in Exhibit F to the

11  Agreement, captioned "Typical effluent characteristics."

12         Although Exhibit F provides maximum values for a number of chemical

13  characteristics, including fluoride, of Pure Wafer's effluent, it is descriptive, not

14  prescriptive. The only reference to Exhibit F in the Agreement is contained within section

15  4.2, and that section incorporates Exhibit F only to define conditions triggering an

16  increase in the sewer rates charged to Pure Wafer:

17              City shall not reclassify the effluent from the Facility or the
                Expansion into any classification other than the Average
18              Residential Classification unless there is a material change in
                the waste water quality from the specifications attached
19              hereto as Exhibit F, which by this reference is incorporated
                herein.
20

21         Nonetheless, Pure Wafer, apparently afraid that the absence of a fluoride limit

22  undermines the existence of its contractual right, has devoted a substantial portion of its

23  briefing and oral argument to attempting to prove the existence of a particular limit,

24  namely 100 mg/L. *See, e.g.*, (Doc. 77 at 16-19; Doc. 83 at 3-7). Pure Wafer argues

25  extrinsic evidence shows the parties intended to limit the effluent to 100 mg/L of

26  fluoride, and, by establishing such limit, to grant Pure Wafer the contractual right to

27  discharge up to that limit. *See id.* Pure Wafer argues that the negotiation discussions

28  leading up to the execution of the Agreement as well as the City's own statements in the

years following its execution evince the parties' agreement to a 100 mg/L limit. (Doc. 77 at 17). The City responds that extrinsic evidence cannot be used to interpret a completely integrated contract such as the Agreement. (Doc. 76 at 8). But although extrinsic evidence cannot vary a term in an integrated contract, it may always be used to aid in *interpreting* contract language. *See Taylor*, 854 P.2d at 1140.

Nevertheless, Pure Wafer's argument fails because the Agreement is not "reasonably susceptible" of Pure Wafer's proffered interpretation. *See id.* There is no term in the Agreement limiting the fluoride concentration of Pure Wafer's effluent; therefore, there is no term for which extrinsic evidence could aid in its interpretation. Moreover, section 4.2 and Exhibit F undermine Pure Wafer's supposed 100 mg/L limit because they expressly contemplate effluent exceeding 100 mg/L in fluoride concentration. Accordingly, the Agreement does not obligate the City to accept Pure Wafer's effluent subject only to the condition that the effluent remain within the limits of Exhibit F, namely 100 mg/L.[9]

Instead, the plain language of section 4.2 of the Agreement obligates the City to accept Pure Wafer's effluent regardless of fluoride concentration.[10] This comports with the balance of section 4.2, which addresses the payment of treatment costs. *See Chandler*

---

[9] Pure Wafer additionally implies that section 14.14 of the Agreement grants it the right to be exempted from any future ordinances that prevent Pure Wafer from realizing the benefits anticipated under the Agreement, including the right to have the City accept its effluent. (Doc. 22 at 4); (Doc. 39-1 at 18). But section 14.14 obligates the City to exempt Pure Wafer from only *moratoriums* on building permits, water hookups, and the like. (Doc. 1-1 § 14.14). The section provides that the City's obligation is "as permitted by A.R.S. § 9-463.06(D)." (*Id.*) Section 9-463.06 defines a moratorium, for purposes of the statute, as "engaging in a pattern or practice of delaying or stopping issuance of permits, authorizations or approvals necessary for the subdivision and partitioning of, or construction on, any land. It does not include denial or delay of permits or authorizations because they are inconsistent with applicable statutes, rules, zoning or other ordinances." A.R.S. § 9-463.06(I)(3).

[10] Although the plain language of the Agreement establishes no upper limit on the fluoride concentration, there may be doctrines of contract law that would imply some limit above 100 mg/L if, for example, Pure Wafer began discharging pure fluoride into the sewer system and this was not contemplated by the parties. For the purposes of the present dispute, this is not at issue because Pure Wafer's current fluoride concentration is approximately 40 mg/L, substantially lower than the 150 mg/L maximum discussed during contract negotiations. Practically, Pure Wafer need only establish that it has the right to discharge at least 100 mg/L, which it has done.

1   *Med. Bldg. Partners*, 855 P.2d at 791 (a contract must be read to "bring harmony, if

2   possible, between all parts of the writing"). The only relationship between a 100 mg/L

3   fluoride concentration and the City's obligations is that the City may change Pure

4   Wafer's sewer rates from the "Average Residential Classification" to another

5   classification (implicitly at a higher rate) if Pure Wafer's effluent exceeds 100 mg/L of

6   fluoride.

7   **2.      The Environmental Obligation Provision**

8       During closing arguments, the City argued that the Agreement grants Pure Wafer

9   the right to discharge effluent containing an *unlimited* concentration of fluoride, subject

10  only to Pure Wafer's obligation to comply with environmental laws. This is a correct

11  statement of the Agreement's terms. However, the City also asserts that section 9.1 of the

12  Agreement, in which Pure Wafer promised to operate its facility "in accordance with all

13  applicable local, state, and federal environmental regulations," permits the City to at any

14  time enact any self-described "environmental" regulations that limit the fluoride

15  concentrations of Pure Wafer's effluent. (Doc. 76 at 9-10). This interpretation is incorrect

16  because the portion of the Ordinance at issue is *not* an environmental regulation.[11]

17      The City's claim that the Ordinance is an environmental regulation is nothing

18  more than a red herring in an attempt to induce the Court to improperly interpret section

19  9.1. Because section 9.1 narrows the scope of Pure Wafer's rights (and narrows the City's

20  corresponding obligation to Pure Wafer), the effect of the City's position would be to

21  rewrite the contractual terms in favor of the City and deprive Pure Wafer of the benefit of

22  its bargain. Pure Wafer agreed to comply with legitimate environmental regulations; it

23  did not agree to comply with cost-shifting regulations passed under the guise of

24  environmental regulations. Pure Wafer's promise to comply with local environmental

25  regulations reserved a measure of discretion to the City to enact, as is its power to do so,

27  _____
[11] The Court emphasizes that its references to the Ordinance mean only the
28  Ordinance's cost-shifting provisions applicable to Pure Wafer. The Court does not
contend that the enactment of a pretreatment program in general is not an environmental
regulation.

1    environmental regulations necessary for the protection of the public interest. The City

2    was obligated to exercise such discretion in good faith.

3            "Arizona law implies a covenant of good faith and fair dealing in every contract."

4    *Bike Fashion Corp. v. Kramer*, 46 P.3d 431, 434 ¶ 13 (Ariz. Ct. App. 2002) (internal

5    quotation marks omitted). The purpose of this covenant is so "neither party will act to

6    impair the right of the other to receive the benefits which flow from their agreement or

7    contractual relationship." *Id.* (internal quotation marks omitted) (quoting *Rawlings v.*

8    *Apodaca*, 726 P.2d 565, 569-70 (Ariz. 1986)). This covenant "guarantees the protection

9    of the parties' reasonable expectations," and is breached either "by exercising express

10   discretion in a way inconsistent with a party's reasonable expectations and by acting in

11   ways not expressly excluded by the contract's terms but which nevertheless bear

12   adversely on the party's reasonably expected benefits of the bargain." *Id.* at 434-35 ¶¶

13   13-14.

14          Pure Wafer reasonably expected section 9.1 to encompass only those regulations

15   actually environmental in character. The portion of the Ordinance that allegedly impairs

16   the City's obligations under the Agreement is not an environmental regulation, and the

17   City cannot in good faith label it as such. The Ordinance reveals by its own terms that it

18   is a cost-shifting regulation:

19                  Nothing in this chapter shall be construed to prevent any
                    special arrangement between the City and any industrial
20                  concern whereby an industrial waste of unusual strength or
                    character may be accepted by the City for treatment, subject
21                  to payment for the cost of such treatment by the industrial
                    concern, except that any special agreement must be at least as
22                  stringent as applicable state and federal requirements.

23
     Prescott, Ariz. Code § 2-1-49 (2014). Thus, although the balance of the Ordinance
24
     requires Pure Wafer to conduct at its own expense pretreatment necessary to reduce its
25
     effluent's fluoride concentration to 16.3 mg/L, this provision clearly establishes that the
26
     City has reserved to itself the discretion to nonetheless accept effluent in excess of that
27
     limit "*subject to payment for the cost of such treatment by [Pure Wafer].*" *Id.* (emphasis
28
     added). This fact alone mandates that the Court consider the Ordinance to not be an

1    environmental regulation but rather a cost-shifting one.

2            Moreover, it is undisputed that Pure Wafer's effluent is lawful under state and

3    federal environmental regulations. If Pure Wafer's elevated fluoride concentrations were

4    an independent violation of a state or federal environmental law, then the City could

5    argue that the Ordinance was properly an environmental regulation because it would

6    proscribe such unlawful activity. But this is not the case. Although the City is obligated

7    under state and federal environmental regulations to supplement the AWRF with

8    pretreatment as necessary so as to prevent violations of its APP, the City points to no

9    environmental regulation requiring the sewer user to conduct the pretreatment or to bear

10   the expense of pretreatment. Indeed, as the Court has explained, the Ordinance itself

11   contemplates the City agreeing to conduct pretreatment in exchange for payment.

12           For these reasons, the Ordinance is not an environmental regulation and thus does

13   not restrict Pure Wafer's contractual right to discharge, and the City's contractual

14   obligation to accept, its effluent into the City's sanitary sewer system.[12] The City is

15   obligated under the Agreement to accept Pure Wafer's effluent, subject to the restrictions

16   of the Agreement, regardless of its fluoride concentration.[13]

17        **B.    The Reserved-Powers Doctrine**

18           The City argues that the Agreement is void in violation of the reserved-powers

19   doctrine. (Doc. 29 at 11; Doc. 76 at 16). Because a state has no obligations under a void

---

[12]  Even if the Ordinance were an environmental regulation, because the Agreement "cannot be applied as broadly and retrospectively as its literal language may suggest," the City would not "avoid Contract Clause analysis merely by establishing that" the Ordinance was an otherwise legitimate exercise of the police power to regulate the environment. *See S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 893 (9th Cir. 2002) (holding that a city cannot "adopt ordinances that compromise [the] material terms" of a contract despite the private entity agreeing to be subjected to future ordinances adopted in the exercise of the city's police powers). Therefore, the Court would still reach the remaining issues discussed in this Order.

[13]  The City contends that the Agreement does not obligate it to construct pretreatment facilities for Pure Wafer. (Doc. 81 at 7). This argument is based on the incorrect premise that pretreatment is necessary to cure Pure Wafer's excessive fluoride discharge; Pure Wafer is not discharging excessive fluoride and is in compliance with all ADEQ regulations. Because the goal of pretreatment is to cure *the City's* violation of its APP, the City is solely responsible for deciding whether to conduct pretreatment and its choice is irrelevant to Pure Wafer's operations.

1  contract, the Court addresses this issue before reaching its Contract Clause analysis. *See*

2  *Matsuda v. City & Cnty. of Honolulu*, 512 F.3d 1148, 1152 (9th Cir. 2008).

3  **1.   Legal Standard**

4      The reserved-powers doctrine defines the "essential attributes of sovereign power"

5  that states reserve to "safeguard the welfare of their citizens" and which cannot be limited

6  by contract. *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 21 (1977). "[T]he scope of

7  the State's reserved power depends on the nature of the contractual relationship with

8  which the challenged law conflicts." *Id.* at 21-22. Thus, the basis for this doctrine differs

9  when a state impairs the "obligation of its *own* contract" from when a state's "general

10  regulatory measures" impair *private* contracts to which the state is not a party. *Id.* at 22-

11  23 (emphasis added).

12      The basis of the reserved-powers doctrine with respect to the state's impairment of

13  its own contractual obligations is the ability of a legislature to "enter into an agreement

14  that limits its power to act in the future." 431 U.S. at 23.

15
16
17
> It is often stated that "the legislature cannot bargain away the police power of a State." This doctrine requires a determination of the State's power to create irrevocable contract rights in the first place, rather than an inquiry into the purpose or reasonableness of the subsequent impairment.

18
19  *Id.* (citation omitted); *see also Matsuda*, 512 F.3d at 1153. Accordingly, when a state has

20  allegedly impaired its own contractual obligations, the proper inquiry is whether it had

21  the power "to create irrevocable contract rights in the first place." *U.S. Trust*, 431 U.S. at

22  23.

23      The state cannot create irrevocable contract rights that restrict its exercise of its

24  police power. *Matsuda*, 512 F.3d at 1153; *RUI One Corp. v. City of Berkeley*, 371 F.3d

25  1137, 1149 (9th Cir. 2004). Because the police power includes "regulations designed to

26  promote the public health, the public morals, or the public safety," *Chicago, B & Q. Ry.*

27  *Co. v. People of State of Ill.*, 200 U.S. 561, 592 (1906), which necessarily includes

28  environmental protection, it follows that the state cannot create contract rights that

restrict its power to impose environmental regulations.

1    On the other hand, although "[a]ny financial obligation could be regarded in
2    theory as a relinquishment of the State's spending power, since money spent to repay
3    debts is not available for other purposes," the Supreme Court has held that financial
4    obligations do not automatically "fall within the reserved powers that cannot be
5    contracted away." *U.S. Trust*, 431 U.S. at 24-25. Thus, a state may, and often does, create
6    irrevocable contract rights "that limit the use of its taxing and spending powers, even
7    though such contracts limit the state's future exercise of discretion in material ways."
8    *Matsuda*, 512 F.3d at 1153.

9    ## 2.    Analysis

10    The City's obligations under the Agreement do not fall under the purview of the
11    police power, and therefore do not implicate the reserved-powers doctrine, because the
12    Agreement does not purport to exempt Pure Wafer from any environmental regulations.
13    To the contrary, the Agreement expressly subjects Pure Wafer to "all applicable local,
14    state, and federal environmental regulations." The Ordinance is not an environmental
15    regulation but rather a cost-shifting regulation, and the Agreement reflects the City's
16    bargain for sewer rates—not a bargaining away of its police power.

17    The City misses the point when it argues that it "retained the power to establish
18    limits on the concentration of constituents in wastewater discharged into its sewer system
19    and to require pretreatment of wastewater from industrial users prior to discharge into the
20    City's sewer system." (Doc. 76 at 17). Both of these statements are correct. What the City
21    is attempting to do, however, and what it *cannot* do, is force Pure Wafer to pay for
22    pretreatment when the City has contractually agreed to not pass along such costs.   The
23    City must accept Pure Wafer's effluent as-is and pretreat it at the City's own expense.

24    Additionally, the authorities the City cites in support of its reserved-powers
25    argument are unhelpful. Under Arizona law, development agreements permit
26    municipalities to create the irrevocable contract rights that *U.S. Trust* requires. *See* A.R.S.
27    §§ 9-500.05, 9-500.11.[14] For this reason, *Hermosa Beach Stop Oil Coalition v. City of*

28

---

[14] The Court cites to the current versions of these statutes because there have been

*Hermosa Beach*, 103 Cal. Rptr. 2d 447 (Ct. App. 2001), to which the City cites, (Doc. 29 at 12; Doc. 76 at 17), is inapposite.[15] In *Hermosa Beach*, the court found the municipality's reinstatement of a ban on oil drilling was not an impairment of its contractual obligations because the contract obligated the oil company to comply with all municipal laws and to obtain drilling permits. 103 Cal. Rptr. 2d at 463, 474. The court specifically noted that the oil company could have avoided such a result if it had entered into a development agreement with the city: "Macpherson could have protected itself from subsequent regulatory changes by insisting that the City enter into a *development agreement* . . . . The agreement, in effect, 'allows a builder to acquire by contract the equivalent of a vested right at an early stage of the project.'" *Id.* at 464 (emphasis added; citation and internal quotation marks omitted) (construing California's development agreement statutes).

Pure Wafer and the City entered into a development agreement for the provision and payment of sewer services; nothing in the Agreement suggests they contracted to bind the City's future exercise of its police power to impose environmental regulations. For this reason, the remainder of the City's cited cases are distinguishable. *Contributors to Pennsylvania Hospital v. City of Philadelphia*, 245 U.S. 20, 23 (1917) has been limited to applications of the power of eminent domain, which is not at issue here. *See U.S. Trust*, 431 U.S. at 24 & n.21; *Matsuda*, 512 F.3d at 1154. The City's other cases are even less on-point. *See N. Pac. Ry. Co. v. Minnesota*, 208 U.S. 583, 598 (1908) (state could not contract away its police power for the purpose of relieving a railroad of its obligation to repair a bridge); *City of Bisbee v. Ariz. Water Co.*, 153 P.3d 389, 396 ¶¶ 23-24 (Ariz. Ct. App. 2007) (company attempted to reserve exclusive rights over water and sewer systems in public streets); *Copper Country Mobile Home Park v. City of Globe*, 641 P.2d 243,

no amendments since the date of the Agreement that are material for the purposes of the Court's present decision.

[15] Moreover, the City relies upon the wrong legal standard when it cites *U.S. Trust*'s discussion concerning the impairment of *private* contracts to which the state is a non-party. *See* (Doc. 29 at 12); *U.S. Trust*, 431 U.S. at 22 (concluding private parties cannot contract to avoid state regulation).

246-47 (Ariz. Ct. App. 1981) (determining whether city *breached* a contract for providing sewer service to homes outside of city limits, an obligation not inherent in its governmental role).

The Agreement does not violate the reserved-powers doctrine.[16] The Court now turns to the crux of the parties' dispute: whether the City violated Pure Wafer's constitutional rights under the Contract Clause.

## C.   Contract Clause

The federal Contract Clause[17] provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts. . . ." U.S. Const. art. I, § 10, cl. 1. Although the Contract Clause purports to be absolute, the Supreme Court has formulated a three-step test for whether the impairment of a contract violates the Clause. "The threshold inquiry is 'whether the state law has, in fact, operated as a substantial impairment of a contractual relationship.'" *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411

---

[16] The City makes one more argument appropriately discussed at this juncture: it asserts that because Pure Wafer demands it be exempt from the Ordinance, Pure Wafer is requesting that the City enact an unconstitutional special law. (Doc. 76 at 18). The Arizona Constitution prohibits the enactment of special laws that "[g]rant[] to any corporation . . . any special or exclusive privileges, immunities, or franchises." Ariz. Const. art. 4, pt. 2, § 19(13). Whether an ordinance is a special law depends upon whether its classification of those subject to its powers "encompasses all members of the relevant class" and "whether the class is elastic, allowing members to move into and out of the class." *Republic Inv. Fund I v. Town of Surprise*, 800 P.2d 1251, 1257 (Ariz. 1990).

The City's argument fails because the City could have satisfied its obligations under the Agreement by not enacting the cost-shifting regulation. There is no requirement that the City enact an ordinance specifically listing Pure Wafer as exempt. For example, if a city contracted with a widget manufacturer to buy a thousand widgets and the city was to pay the freight costs, and the city subsequently enacted an ordinance requiring all city suppliers to bear freight costs, the city could not avoid the ramifications of its ordinance by now claiming that the widget manufacturer is demanding a special law.

The Court also notes that the Agreement entitles Pure Wafer to pay residential sewer rates for its industrial effluent, yet the City is not contending that this aspect of the Agreement is also a special law. Clearly, every bargained for benefit vis-à-vis a municipality is not a special law.

[17] Because the contract clause of the Arizona Constitution, Ariz. Const. art. 2, § 25, is identical in application to the Contract Clause of the U.S. Constitution, *see Phelps Dodge Corp. v. Ariz. Elec. Power Co-op., Inc.*, 83 P.3d 573, 597 ¶¶ 100-01 (Ariz. Ct. App. 2004) the Court for convenience references only the federal Contract Clause when referring to both clauses.

1   (1983) (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 243 (1978)). This

2   inquiry has itself three components: "whether there is a contractual relationship, whether

3   a change in law impairs that contractual relationship, and whether the impairment is

4   substantial." *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992); *see also RUI One*

5   *Corp. v. City of Berkeley*, 371 F.3d 1137, 1147 (9th Cir. 2004). "The first sub-inquiry is

6   not whether any contractual relationship whatsoever exists between the parties, but

7   whether there was a 'contractual agreement regarding the . . . specific terms allegedly at

8   issue.'" *RUI One Corp.*, 371 F.3d at 1147 (quoting *Gen. Motors*, 503 U.S. at 187).

9   **1.      The Contractual Relationship**

10      As the Court has already concluded, a contractual relationship exists between the

11   City and Pure Wafer granting Pure Wafer the right to discharge up to 195,000 gallons per

12   day of effluent of any fluoride concentration into the City's sanitary sewer system. The

13   Agreement also provides that the City may not assess sewer charges against Pure Wafer

14   other than those listed in the Agreement: "No up-front or other fees or costs shall be

15   imposed on Developer with respect to the Sewer Capacity provided for herein, except as

16   provided in Section 4.5."[18]

17      Consequently, the contractual right at issue is Pure Wafer's right to discharge its

18   effluent, regardless of fluoride concentration, into the City's sanitary sewer system under

19   the terms specified in the Agreement. The Court thus turns to the second inquiry under

20   the Contract Clause: whether the City's enactment of the ordinance impaired its

21   obligations to Pure Wafer under the Agreement.

22   **2.      Impairment**

23      When the state is a party to the contract alleged to be impaired, the question of

24   _____

25   [18] The City contends that section 4.2 of the Agreement does not require the City to
    construct a pretreatment facility for Pure Wafer's effluent. (Doc. 76 at 12). Although the

26   City is correct that the Agreement does not contain such a provision, the City's argument
    is without merit because the Agreement clearly limits Pure Wafer's charges for sewer

27   services. Nor would the Agreement be reasonably expected to include such a provision
    because Pure Wafer does not obtain any benefits from a pretreatment facility; the City

28   chooses to construct a pretreatment facility because it, not Pure Wafer, must meet ADEQ
    obligations.

impairment "turns on whether the State has used its law-making powers not merely to breach its contractual obligations, but to create a defense to the breach that prevents the recovery of damages." *See Univ. of Hawai'i Prof'l Assembly v. Cayetano*, 183 F.3d 1096, 1102 (9th Cir. 1999). Thus, an ordinary breach of contract is not an impairment; the government impairs its contractual obligations only when it uses the legislative power to relieve itself of those obligations, which prevents the other party from seeking remedies for what would otherwise be a breach of contract.

The Ordinance impairs the City's obligations under the Agreement because it permits the City to reject Pure Wafer's effluent if it exceeds 16.3 mg/L of fluoride despite the City having the contractual obligation to accept that effluent. According to the City's logic, this violation of the Agreement is not a breach of contract because Pure Wafer agreed to not discharge effluent in violation of local environmental regulations. But Pure Wafer neither anticipated nor agreed that it would comply with cost-shifting regulations cloaked as environmental regulations. *Cf. Seven Up Pete Venture v. State*, 114 P.3d 1009, 1021-22 (Mont. 2005) (finding an impairment of contractual obligations when the state enacted environmental laws that "banned the future use of the very method of mining upon which the contract itself was based" despite the contract obligating the plaintiff to comply with "all applicable . . . laws . . . including . . . those concerning safety, environmental protection and reclamation."). The City's use of section 9.1 as a shield against a breach of contract claim by Pure Wafer is improper and gives rise to the City's impairment of its contractual obligation to Pure Wafer.[19]

### 3.     Substantial Impairment

"An impairment of a public contract is substantial if it deprives a private party of an important right, thwarts performance of an essential term, defeats the expectations of the parties, or alters a financial term." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 890 (9th Cir. 2003) (citations omitted). Incredibly, the City argues that even if it has

---

[19] The City additionally argues that impairment of an obligation cannot be based upon an implied or ambiguous term. (Doc. 76 at 19). There are no relevant implied or ambiguous terms in the Agreement; therefore, the City's argument is without merit.

1  impaired its contractual obligations, any such impairment is not substantial because Pure

2  Wafer should have anticipated environmental regulations limiting its fluoride discharge.

3  (Doc. 76 at 21-22). The City claims that because ADEQ regulates Pure Wafer directly,

4  "changes from time to time" in environmental regulations "are simply a fact of life for

5  businesses." (*Id.*) But Pure Wafer complies with all ADEQ requirements and is not

6  subject to any ADEQ regulation as to its fluoride discharge levels. It is disingenuous to

7  contend that Pure Wafer had no substantial interest in its rights under the Agreement

8  merely because it is subject to some environmental regulation.[20]

9        Pure Wafer presented undisputed evidence that its operations require the discharge

10  of effluent with a fluoride concentration above 16.3 mg/L, that it expected at the time of

11  the Agreement to be able to discharge at concentrations of up to 100 mg/L, that this right

12  was critical to its negotiations based on its past experiences with its San Jose facility, and

13  that the financial viability of the Prescott facility is threatened if it must bear the

14  pretreatment costs. The impairment is substantial.

15        **4.**      **The Ordinance's Public Purpose**

16        Because the Court concludes that the City substantially impaired its obligations

17  under the Agreement, the burden shifts to the City to prove that the impairment was "both

18  reasonable and necessary to fulfill an important public purpose." *Cayetano*, 183 F.3d at

19  1106 (citation and internal quotation marks omitted); *see also Energy Reserves Grp.*, 459

20  U.S. at 411-12. Because when the State is a party to the contract, its "self-interest is at

21  stake," "complete deference to a legislative assessment of reasonableness and necessity is

22  _____

23        [20] The City makes a related argument that any financial harm to Pure Wafer from

24  the Ordinance is the "collateral financial impact of environmental laws" and is not
actionable under the Contract Clause. (Doc. 81 at 9-10). For this proposition, the City

25  relies upon *RUI One Corporation*, which addressed the impact of a "living wage" law
requiring employers who leased City of Berkley land to pay increased wages to their

26  employees. 371 F.3d at 1145-46. That case is distinguishable because there the employer
had leased land from the city for the operation of a restaurant and the agreement did not

27  contain any provisions concerning employee pay. *Id.* at 1146, 1148. The Ninth Circuit
Court of Appeals correctly concluded that "[e]mployee wages and benefits are not closely
connected to the express provisions of the lease agreement" and therefore were not

28  implied into the agreement. *Id.* at 1148. Here, Pure Wafer and the City specifically
negotiated the rates and specifications for sewer services.

not appropriate." *U.S. Trust*, 431 U.S. at 26. The State is "not free to consider substantial contractual impairments on a par with other policy alternatives." *S. Cal. Gas*, 336 F.3d at 894; *see also U.S. Trust*, 431 U.S. at 26 ("A governmental entity can always find a use for extra money . . . . if a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all.").

In determining whether a substantial impairment is reasonable, the Court considers "the extent of the impairment as well as the public purpose to be served." *S. Cal. Gas*, 336 F.3d at 894-95 (quoting *Cayetano*, 183 F.3d at 1107). "[A]n impairment is not a reasonable one if the problem sought to be resolved by an impairment of the contract existed at the time the contractual obligation was incurred." *Id.* at 895 (quoting *Cayetano*, 183 F.3d at 1107). "Changed circumstances and important government goals do not make an impairment reasonable if the changed circumstances are 'of degree and not kind.'" *Id.* (quoting *U.S. Trust*, 431 U.S. at 32). "On the other hand, if a statute causes unforeseen and unintended consequences such that private parties would obtain windfalls they never expected, later amendment to realign a statute with the parties' expected bargain may be reasonable." *Id.* at 895.

In *Southern California Gas*, the plaintiff utility had contracted with the city to provide gas service. 336 F.3d at 887. The contract obligated the utility to obtain permits to trench or excavate streets and also to promptly repair "any portion of any street" damaged at its own expense. *Id.* at 887-88. It also subjected the utility's rights to "all of the ordinances, rules and regulations heretofore or hereafter adopted by the [city] in the exercise of its police powers." *Id.* at 888. The city subsequently enacted an ordinance requiring advance payment for trenching and excavation of city streets. *Id.* The Court of Appeals concluded that the substantial impairment was unreasonable because the city's initial miscalculation of the "degree of harm to city streets from trench cuts" did not permit the city to alter the contract "whenever later studies reveal the extent of damage from trenching is greater than anticipated." *Id.* at 896. The court held that "to the extent

1    [the city] seeks to charge the Gas Company for harms admittedly known in 1938, the

2    trench cut ordinance is unreasonable." *Id.*

3        In this case, at the time the parties entered into the Agreement, the City was not

4    subject to fluoride testing and had not yet been confronted with ADEQ violations

5    concerning the AWRF's fluoride levels. But the evidence shows the City knew of the

6    potential for excessively high concentrations—it discussed various fluoride limits with

7    Pure Wafer, including 150 mg/L and 100 mg/L. Clearly, the City was aware at the time it

8    entered into the Agreement that there existed some level of fluoride concentration that

9    would require treatment prior to its ultimate discharge. That the City inaccurately

10   estimated the particular fluoride concentration above which treatment (or pretreatment) is

11   required does not make the impairment reasonable. The City's compliance with its APP

12   is an important governmental goal, but the changed circumstances caused by the APP

13   obligations are "of degree" and not of "kind." *See S. Cal. Gas*, 336 F.3d at 895. The City

14   has not proven the impairment to be reasonable.

15       The City argues that the Ordinance serves a legitimate public purpose because it

16   conforms with state and federal environmental regulations and "protects the integrity of

17   the City's water supply and sanitary sewer system for current citizens and future

18   generations." (Doc. 76 at 22). Thus, the City implies that if Pure Wafer does not bear the

19   pretreatment costs, the quality of the City's water supply will be jeopardized. But this

20   logical fallacy ignores the fact that if Pure Wafer does not pretreat its effluent, the City

21   will do so to comply with its APP. Counsel for the City has suggested as much to the

22   Court, albeit informally. (Tr. 12/19/13 at 128:12-17). Unless the City is contending that it

23   will willingly violate its ADEQ consent order as well as state and federal environmental

24   regulations if forced to pay to pretreat Pure Wafer's effluent, this appeal to emotion is

25   baseless. There is no evidence suggesting that the enactment of the Ordinance's cost-

26   shifting provisions will improve the water quality of the aquifer. The City's pretreatment

27   program may improve the quality of AWRF discharge, but the issue is not whether the

28   Ordinance's creation of the *pretreatment program* is permissible; the issue is whether the

1    *cost-shifting to Pure Wafer* is permissible. The Ordinance[21] is not reasonable to fulfill an

2    important public purpose because it does not further any important public purpose (for

3    example, environmental protection).

4         Because the City fails to prove that the Ordinance was reasonable, the Court need

5    not consider whether the Ordinance was necessary. Nevertheless, the Court finds that the

6    City has not proven necessity. An ordinance "is not necessary if more moderate

7    alternatives would serve [the city's] purposes equally well without impairing [the

8    contract]." *Id.* at 896. "When a state or city impairs its own agreements by imposing

9    additional financial burdens on a private party, obvious more moderate alternatives

10   include raising revenues through higher taxes or preserving funds through budget

11   restrictions." *Id.* (citing *Cayetano*, 183 F.3d at 1107). The City's Ordinance may be

12   useful for the City's coffers, but imposing an additional financial burden on Pure Wafer

13   is not necessary for reducing the AWRF fluoride concentration levels. *See id.*

14        Furthermore, the Ordinance itself completely undermines the City's argument as

15   to necessity. Restricting the fluoride concentration in accepted effluent to 16.3 mg/L

16   cannot be necessary when the Ordinance also permits the City to contract for acceptance

17   of effluent in excess of that limit. *See* Prescott, Ariz. City Code § 2-1-49 (2014). The only

18   difference between the Agreement and contracts permitted under the Ordinance is which

19   party bears the treatment costs. The City noted as much when it remarked that "ultimately

20   the only question is who should pay the cost of bringing the Facility into compliance with

21   the amended City Code." (Doc. 29 at 15-16). Reducing the City's expenditures is not a

22   justification for impairing the City's obligations.[22] *See U.S. Trust*, 431 U.S. at 26 ("A

23

24        [21] The Court reemphasizes that its references to the Ordinance mean the
     Ordinance's cost-shifting provisions applicable to Pure Wafer. *See supra* note 11. The
25   Court is not commenting on the necessity or reasonableness of a pretreatment program
     (which may be both reasonable and necessary), only on the shifting of the pretreatment
26   costs to Pure Wafer. Pretreatment in general may further the important public purpose of
     protecting the environment.

27        [22] The City also argues that the Ordinance is necessary because it is substantially
     more expensive for the City to pretreat Pure Wafer's effluent at the AWRF than it is for
28   Pure Wafer to pretreat its effluent on-site. (Doc. 76 at 23). Even assuming this to be true,
     this fact does not justify the Ordinance; it merely suggests that as rational actors, the City

governmental entity can always find a use for extra money . . . . if a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all.").

The City fails to prove that its impairment of its obligations is reasonable, most succinctly because the Ordinance's cost-shifting provisions have no legitimate public purpose. Even if the City could prove the impairment is reasonable, it has also failed to prove the impairment was necessary. Because the Ordinance substantially impairs the City's obligations under the Agreement and the City has not shown that the impairment is reasonable and necessary to fulfill an important public purpose, the City's enactment of the Ordinance violates Pure Wafer's constitutional rights under the Contract Clause.

### D.   Alternative Claims

Because the Court finds in favor of Pure Wafer on its Contract Clause claims, the Court need not reach Pure Wafer's alternative claims for breach of contract and the implied covenant of good faith and fair dealing. *See* (Doc. 77 at 25).

### E.   Injunctive Relief

Pure Wafer seeks a permanent injunction enjoining the City from enforcing the Ordinance. A plaintiff seeking a permanent injunction must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2008). However, "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable [harm] is necessary." *Nat'l Solid Wastes Mgmt. Ass'n v. City of Dallas*, 903 F. Supp. 2d 446, 470 (N.D. Tex. 2012). "Additionally, irreparable harm may result if enforcement of an ordinance would yield fines and criminal penalties." *Id.* at 470-71.

---

and Pure Wafer should negotiate to locate the pretreatment equipment at Pure Wafer's facility.

The City has not only violated Pure Wafer's constitutional rights, but Pure Wafer also faces both immediate fines and criminal penalties for noncompliance with the Ordinance. The City may fine Pure Wafer up to $25,000 per violation per day in administrative fines, up to $25,000 per violation per day in civil penalties, and criminal penalties including fines and imprisonment. If the Ordinance is enforced against Pure Wafer, Pure Wafer will be forced to choose between asserting its valid rights under the Agreement and facing fines and criminal prosecution for noncompliance with the Ordinance. Pure Wafer has shown that enforcement of the Ordinance will cause irreparable harm for which no amount of monetary damages can adequately compensate. *See id.* at 471.

Additionally, the balance of the hardships between the City and Pure Wafer favors Pure Wafer. If the Ordinance is enforced against Pure Wafer, Pure Wafer faces irreparable harm, while if the City is enjoined from enforcing the Ordinance against Pure Wafer, the City merely must construct a pretreatment facility at its own expense. The City has not alleged that the expense of pretreating Pure Wafer's effluent threatens its continued operation, but the evidence shows that Pure Wafer may be forced to shut down its facility if the Ordinance is enforced. Equity favors Pure Wafer.

Finally, the public interest would not be disserved by a permanent injunction. As the Court has explained, the Ordinance serves no legitimate public interest because although a pretreatment program may be in the public interest, there is no public interest in shifting the costs of that pretreatment to Pure Wafer in violation of the Agreement.[23] Moreover, any public interest in obtaining additional money for the City's coffers does not substantially outweigh the public benefits flowing from Pure Wafer's employment and operation of the facility, such as tax revenues.

For these reasons, the Court concludes that a permanent injunction is an appropriate remedy. The City argues that any injunction should issue against only the

_____

[23] Consequently, the City's renewed arguments that the Ordinance is necessary to protect water quality and comply with ADEQ requirements are wholly unfounded. *See* (Doc. 76 at 27).

City because the individual defendants were named only in their official capacities and Pure Wafer has not presented evidence that any particular City employee committed an unlawful act. (Doc. 76 at 29). The Court agrees. Any injunction against the City will necessarily bind City "officers, agents, servants, employees, and attorneys." *See* Fed. R. Civ. P. 65(d)(2)(B).

### F.    Damages

The parties stipulated, and the Court agreed, to bifurcate the trial on the merits into a liability phase and damages phase. (Doc. 60). The parties agree that a ruling in favor of Pure Wafer on its Contract Clause claims and awarding declaratory and injunctive relief obviates any need to determine damages. (Doc. 76 at 30; Doc. 77 at 25). Therefore, this Order resolves all pending issues and there will be no damages phase of the trial.

### G.    Attorneys' Fees

Both sides have requested costs and attorneys' fees. Pure Wafer requests fees pursuant to 42 U.S.C. § 1988, A.R.S. § 12-341.01, and section 14.16 of the Agreement. (Doc. 19 at 23). Because Pure Wafer has prevailed on a matter arising out of contract (specifically, the Agreement) and the Ordinance deprives Pure Wafer of its constitutional rights, all three of these authorities support a fee award. *See S. Cal. Gas*, 336 F.3d at 886-87 (holding that a Contract Clause violation gives rise to a 42 U.S.C. § 1983 claim and a corresponding award of attorneys' fees under section 1988); A.R.S. § 12-341.01 ("In any contested action arising out of a contract, express or implied, the court may award the successful party reasonable attorney fees."); (Ex. 3 § 14.16) ("In . . . any action in any court . . . to enforce any covenant or any of such party's rights or remedies under this Agreement, including any action for declaratory or equitable relief, the prevailing party shall be entitled to reasonable attorneys' fees and all reasonable costs, expenses and disbursements in connection with such action."). Thus, Pure Wafer is entitled to its reasonable attorneys' fees and costs.

### IV.   CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** denying as moot Pure Wafer's Motion for Preliminary Injunction (Doc. 22).

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter judgment for Pure Wafer and against Defendants on Pure Wafer's claims for violations of the federal Contract Clause and the State Contract Clause.

**IT IS FURTHER ORDERED** dismissing as moot Pure Wafer's alternative claims for breach of contract and for breach of the implied covenant of good faith and fair dealing.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter judgment for Pure Wafer and against the City on the City's counterclaim for a declaratory judgment.

**IT IS FURTHER ORDERED** granting Pure Wafer's request for a permanent injunction. The City is enjoined from enforcing City of Prescott Ordinance No. 4856-1313 against Pure Wafer with respect to the following provisions: (1) any fluoride concentration limit established in that ordinance; (2) any wastewater pretreatment requirement relating to fluoride concentration; and (3) the following provisions of the City of Prescott Code to the extent that they are inconsistent with section 4.1 or section 4.2 of the Agreement: 2-1-18(L), 2-1-21(C), 2-2-21(H), 2-1-39(F) to (L), 2-1-44, 2-1-45, 2-1-46, 2-1-48(F), 2-1-49, 2-1-53, and 2-1-72-1.

**IT IS FURTHER ORDERED** denying the City's request for an award of attorneys' fees and costs.

/ /

/ /

/ /

/ /

/ /

/ /

/ /

1    **IT IS FURTHER ORDERED** that Pure Wafer may move for an award of

2    attorneys' fees and non-taxable costs in accordance with Local Rule of Civil Procedure

3    54.2.

4    Dated this 17th day of April, 2014.

5

6

7    _____

8    James A. Teilborg
     Senior United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28